# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3917 | **DATE** | September 30, 2004 |
| **CASE TITLE** | Richard Stephenson, eta al v. Hartford, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motions to dismiss the Third Amended Complaint [78-1, 80-1, 81-1] are denied. Discovery is to proceed forthwith. A status is set for November 3, 2004 at 11:00 am. ENTER MEMORANDUM OPINION.

(11) x [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| X | Notices MAILED by judge's staff. | | | OCT 0 1 2004 | | |
| | Notified counsel by telephone. | | | date docketed | | 106 |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | | | |
| | Copy to _____ | | | date mailed notice | | |
| KAM | courtroom deputy's initials | | | KAM | mailing deputy initials | |

Date/time received in central Clerk's Office
(Reserved for use by the Court)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RICHARD J. STEPHENSON, STEPHENSON )
MASTER LP, STEPHENSON/ZION           )
INSURANCE TRUST, MIDWESTERN          )
REGIONAL MEDICAL CENTER, INC.,       )
and CANCER TREATMENT CENTERS OF      )
AMERICA, INC.,                       )
                                     )
            Plaintiffs,              )
                                     )
      v.                             )
                                     )    No. 02 C 3917
HARTFORD LIFE AND ANNUITY            )
INSURANCE COMPANY, HARTFORD LIFE,    )
INC., HARTFORD LIFE INSURANCE        )
COMPANY, INC., OGILVIE SECURITY      )
ADVISORS CORP., GERALD D. RICKEN,    )
MICHAEL E. KOHN, and APPLIED         )
INNOVATIVE MONETARY SOLUTIONS, LLC,)
                                     )
            Defendants.              )

**DOCKETED**

OCT 0 1 2004

### MEMORANDUM OPINION

Before the court are defendants' motions to dismiss the Third Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u - 4(b). For the reasons set forth below, the motions are denied.

### BACKGROUND[1]

#### A.      The Parties

This action arises out of the 2001 purchase of a variable

---

[1] The following facts are drawn from the Third Amended Complaint ("the TAC") and are taken as true for purposes of this motion.

life insurance policy ("the 2001 Policy" or "the Policy") insuring plaintiff Richard J. Stephenson. In addition to Stephenson, plaintiffs are several of his related partnerships and corporations: Stephenson Master LP, an Illinois limited partnership of which Stephenson is the limited partner; Stephenson/Zion Insurance Trust, an Illinois trust and owner and beneficiary of a 1998 life insurance policy covering Stephenson; Midwestern Regional Medical Center, Inc., an Illinois corporation of which Stephenson is the Chairman and a shareholder("MRMC"), and Cancer Treatment Centers of America, Inc., another Illinois corporation, of which Stephenson is the Chairman and sole shareholder ("CTCA").

Defendant Hartford Life and Annuity Insurance Co., a Connecticut company and subsidiary of defendants Hartford Life, Inc. and Hartford Life Insurance Co., Inc. (collectively, "Hartford"), issued the 2001 Policy. Defendant Michael Kohn is a Missouri lawyer, specializing in tax law, and served as plaintiffs' tax lawyer from 1997 through May 2002. Defendant Gerald Ricken is an insurance salesman, licensed in Illinois and Colorado, who had an agency agreement with Hartford. Defendant Applied Innovative Monetary Solutions, LLC ("AIMS") is a Missouri company through which Kohn and Ricken conducted business. On information and belief, Kohn was the Chairman and founder of AIMS, and Ricken was its President and CEO. On information and belief, Kohn and Ricken shared the costs of, and income generated by, AIMS. Kohn and Ricken are brothers-in-law and shared office space.

Defendant Ogilvie Security Advisors Corp. is an Illinois broker-dealer and member firm of the National Association of Securities Dealers ("NASD"). Ricken was a NASD-registered representative and broker of Ogilvie. Thus, Ricken conducted his business as a broker of Ogilvie, through AIMS, and, on information and belief, contributed his commissions from the sale of Hartford variable life insurance policies to AIMS.

**B.    The 1998 Policies**

In 1998, Stephenson Master, Stephenson/Zion, MRMC and CTCA purchased two variable life insurance policies insuring Stephenson. The first policy, issued by Hartford, insured Stephenson in the amount of $13 million ("the 1998 Hartford Policy"). The second policy, issued by American General Life Insurance Company, insured Stephenson in the amount of $27 million ("the American General Policy"). Together, then, the 1998 policies provided Stephenson with $40 million in coverage. Stephenson/Zion is the owner and beneficiary of the 1998 Hartford Policy and Stephenson Master is the owner and beneficiary of the American General Policy.

Based on Kohn's advice, plaintiffs structured split-dollar and collateral assignment agreements for each of the 1998 policies, under which MRMC is the assignee of the 1998 policies and MRMC, CTCA, Stephenson/Zion and/or Stephenson Master pay the premiums.[2]

---

[2]A split-dollar arrangement is a contractual agreement under which an employer contracts with its employee to pay some or all of the annual premiums on a life insurance policy for the

C.      **The 2001 Policy**

On January 27, 2001, the Internal Revenue Service clarified its prior rulings regarding the taxation of split-dollar life insurance arrangements and provided taxpayers with interim guidance on the requirements for such tax treatment in IRS Notice 2001-10, 2001-5 I.R.B. 459 ("the IRS Notice" or "the Notice"). The Notice provided, *inter alia*, that an employer's payments under a split-dollar arrangement could be characterized as loans for tax purposes, and set forth guidelines for determining the characterization and tax treatment of such loan split-dollar arrangements.

Shortly after issuance of the IRS Notice, Hartford, Kohn, Ricken and AIMS approached plaintiffs and represented that the IRS Notice required the purchase of a new universal variable life insurance policy, and further, that plaintiffs could achieve substantial cost savings by replacing the 1998 policies with a new policy.

In May 2001, Kohn, Ricken and AIMS arranged with Hartford

---

employee and the employer and employee split the policy benefits. Under a collateral assignment split-dollar arrangement, the employee is formally designated as the owner of the policy and pays the entire premium, while the employer in form makes annual loans, without interest (or below the fair rate of interest) to the employee of amounts not to exceed the annual premiums. The employee executes an assignment of the policy to the employer as collateral security for the loans, which are generally payable upon the termination of employment or the death of the employee. (See Third Amended Complaint, ¶ 24, citing IRS Ruling 64-328.)

and Ogilvie for the issuance and sale of the 2001 Policy, another Hartford policy, which insured Stephenson in the amount of $42 million. Hartford issued the 2001 Policy as a Colorado policy on or about May 22, 2001. Ricken sold the 2001 Policy to plaintiffs through AIMS as a registered representative and broker of Ogilvie, after signing Hartford's Policy Application for the 2001 Policy as Hartford's "Licensed Agent."

## D. Alleged Misrepresentations

Between February and June 2001, Hartford, Kohn, Ricken and AIMS engaged in oral and written communications with each other relating to the 2001 Policy. Through their communications, Hartford representatives – including one or more "high-level" executives, product designers, internal actuaries, and attorneys – made the following representations to Kohn, Ricken and/or AIMS: (i) plaintiffs had to purchase a *new* universal variable life insurance policy with $42 million in coverage to meet their "life insurance, tax, and investment objectives under the IRS Notice; (ii) the total costs (including sales charges and premium tax costs) of the 2001 Hartford Policy would be 60% less than the costs that plaintiffs were incurring under the 1998 policies; (iii) plaintiffs could make up to $4 million in annual "unscheduled premium payments" and then withdraw or "pass through" up to $4 million without payment of any costs under the 2001 Policy; and (iv) plaintiffs were required to reduce the coverage on Stephenson under the American General Policy

from $27 million to $3 million, and cancel the 1998 Hartford Policy, as preconditions to issuing the 2001 Policy. According to plaintiffs, Hartford knew or should have known that Kohn, Ricken, and/or AIMS would communicate these representations to plaintiffs. Alternatively, plaintiffs allege, on information and belief, that Hartford directed them to do so.

Kohn, Ricken and/or AIMS did convey Hartford's representations to plaintiffs in numerous in-person meetings, correspondence and telephone conversations between February and June 2001. During these discussions, Kohn, Ricken and/or AIMS attributed the statements to Hartford. In addition, Kohn, Ricken and/or AIMS made further representations of their own. Specifically, on either February 1 or 2, 2001, at the AIMS office in St. Louis, Missouri, Kohn described the proposed 2001 Policy to Phillip Picchietti, CFO of MRMC and CTCA and a financial adviser to Stephenson and his family, and to Stephen Bonner, CEO of CTCA, who joined in the meeting by telephone. Then, on February 2, 2001, Kohn presented the 2001 Policy proposal to Stephenson in a face-to-face meeting. Others present at the February 2 meeting included Picchietti, Dennis Lynde, "Tax Director of MRMC and CTCA," and Michael Coulter Smith, an MRMC boardmember and Trustee of Stephenson/Zion and Stephenson Master. Ricken attended a portion of these meetings.

At these meetings, it was represented to plaintiffs that:

(i) the IRS Notice *required* plaintiffs to purchase a new life insurance policy to obtain the tax treatment authorized by the Notice, and to achieve their other investment and life insurance objectives; (ii) Hartford offered such a policy; and (iii) plaintiffs "could not use their existing 1998 policies under the IRS Notice." Kohn repeated these representations during a February 16, 2001 telephone conference with Picchietti, Lynde and Bonner and others. Then, at a March 1, 2001 meeting with Picchietti, Lynde and Smith, again at AIMS's office, Kohn and Ricken made the following representations: (i) the Notice required plaintiffs to purchase a new policy, with approximately $40 million in coverage, for plaintiffs to obtain the tax treatment authorized by the Notice, and to achieve their other investment and life insurance objectives, including the ability make up to $4 million in annual "unscheduled premium payments" and then withdraw or "pass through" up to $4 million without payment of any costs; (ii) the policy terms and tax benefits – including the absence of costs on unscheduled premiums – were possible only "because of the tax treatment recently approved in the IRS Notice and because of a new type of policy being offered by Hartford"; (iii) plaintiffs would have to reduce the coverage under the American General Policy and cancel the 1998 Hartford Policy; and (iv) the total costs of purchasing the 2001 Policy would be "much lower" than plaintiffs' costs under the 1998 policies.

Also during the March 1 meeting, Picchietti was provided with "Hartford Policy illustrations" dated February 28, 2001 and March 1, 2001 representing again, *inter alia*, that $4 million could be "passed through" the Policy free of charge. The Hartford illustrations were provided to Ricken by Cliff Barron in Hartford's Product Management Department.

Thereafter, in a March 7, 2001 letter to Stephenson, Kohn stated that "high-level" individuals at Hartford, as well as Kohn and Ricken, had designed and structured the 2001 Policy to meet plaintiffs' objectives, that "no one has ever structured such a platform," and that "legal representatives at the Hartford" had provided Kohn with "Arthur Andersen's analysis" of the proposed transaction. The March 7 letter also detailed the proposed plan for plaintiffs' purchase of the 2001 Policy, and expressly represented the following:

> Because the IRS Notice 2001-10 requires a new policy be acquired after the date of the Notice, we requested of Hartford that they absorb any costs or surrender charges in connection with exchanging the existing policy for a new policy. We cannot use any existing policy . . . The [1998] Hartford Policy will be exchanged for the new policy.

In a subsequent letter to Stephenson dated April 10, 2001, on which Picchietti, Lynde and Smith were copied, Kohn represented that the American General Policy could not be used in a loan split-dollar agreement because such treatment "is only afforded to policies

acquired after the date of the Notice (January 16, 2001)."

Then, during a conference call with Stephenson and Picchietti on or about May 17, 2001, Kohn summarized the steps necessary to implement the purchase of the 2001 Policy and to allow plaintiffs to make a total of $8 million in unscheduled premium payments and withdrawals between June 2001 and June 2002 "free of any tax loads, or commissions."

Days later, in an e-mail dated May 20, 2001 from Ricken to Picchietti, Ricken directed plaintiffs to make the first monthly premium payment for the 2001 Policy on May 31, 2001. In this e-mail, Ricken also assured plaintiffs that he would work directly with Hal Brooks of Hartford to ensure that Hartford was ready for CTCA's $4 million unscheduled premium payment and Stephenson's $4 million withdrawal, both to occur on May 31, 2001. However, despite defendants' repeated representations that unscheduled premium payments would be "passed through" free of charge, Hartford levied approximately $500,000 in commissions, premium costs, surrender charges, and other costs or loads on the withdrawal. Hartford refused to refund any of these charges to plaintiffs.

The 2001 Policy provided for a "free-look" period in which plaintiffs had twenty days from the date of receipt to rescind the Policy. During this "free-look" period, which began on May 31, 2001 and ended June 19, 2001, defendants made further misrepresentations to plaintiffs. Following Hartford's $500,000

charge on Stephenson's May 31 withdrawal, Picchietti and Smith, in e-mail correspondence to Kohn and Ricken dated June 1 and 4, 2004, demanded that defendants confirm the total premiums, costs, loads and other charges to be incurred under the 2001 Policy. They also insisted that future unscheduled premiums be free of charges of any kind, and demanded an explanation for the May 31 charge.

In response, on or about June 1, 2001, Ricken and Kohn provided Picchietti with a Hartford Policy Illustration dated June 1, 2001, which again purported to show that plaintiffs' costs and expenses under the 2001 Policy would be substantially lower than those under the 1998 policies. In subsequent correspondence, including a letter dated June 5, 2001 from Kohn to Picchietti, and copying Stephenson, Lynde and Smith, defendants represented to plaintiffs: (i) that Hartford "will guarantee in writing that the next Four Million Dollars ($4,000,000) will flow as represented" and that future withdrawals of unscheduled premium payments would not be subject to charges; (ii) that by merging the 1998 Hartford Policy into the 2001 Policy, the surrender charges for the 1998 Hartford Policy would be "moved" to the new 2001 Hartford Policy and plaintiffs would not pay charges for cancellation of the 1998 Hartford Policy; and (iii) the "entire cost of the [new] insurance would be less than 10%-15% of what is being paid annually now for less insurance." Finally, in a June 6, 2001 letter from Kohn to Picchietti, with copies to Stephenson, Lynde and Smith, Kohn warned

that "it would be wasteful and ill-advised to reverse course now."

According to plaintiffs, and contrary to defendants' representations, the IRS Notice did not require that a new life insurance policy be purchased, i.e., one issued after the release of the IRS Notice, in order to be used in a loan split-dollar arrangement. Put another way, the IRS Notice did not prohibit the use of then-existing life insurance policies in a newly-formed loan split-dollar agreement. The requirements of the Notice, according to plaintiffs, "are clear and obvious to anyone, especially those in the tax or life insurance industry." Further, the total costs of the 2001 Hartford Policy were, in fact, higher than the costs under the 1998 policies. Plaintiffs have incurred costs in excess of $1.3 million more than what they would have incurred under one or both of the 1998 policies. Included in this amount are surrender charges that are still in effect on the 1998 Hartford Policy, which has not been cancelled, as well as charges imposed by Hartford on the withdrawals plaintiffs have made on the 2001 Policy.

Plaintiffs allege that all of defendants' misrepresentations were made to induce plaintiffs to purchase the 2001 Policy. Plaintiffs aver that they in fact did rely on defendants' representations in deciding to purchase the 2001 Policy, and had they known that the IRS Notice did not require the purchase of a new policy and that the costs of the new policy would exceed those

associated with the 1998 policies, they would not have made the purchase.

In addition, plaintiffs allege, on information and belief, that in making these representations, Kohn acted not only as plaintiffs' tax attorney, but also as an "undisclosed agent" of Hartford. On information and belief, Hartford authorized Kohn to act on its behalf in selling the 2001 Hartford Policy. Kohn also acted as an agent of Hartford by working with Ricken, who was an "exclusive agent" of Hartford, to facilitate plaintiffs' purchase of the 2001 Policy. On information and belief, Kohn and Ricken received substantial commissions of approximately $600,000 from Hartford, and directly or indirectly through AIMS, for their work in selling the 2001 Policy.

## E.     **Allegations of Scienter**

Plaintiffs allege generally that defendants acted with scienter in that their misrepresentations were made either with knowledge that they were false and/or in reckless disregard of their falsity: defendants "failed to ascertain and to disclose the true facts to Plaintiffs, even though such facts were available to them." We begin with the allegations of scienter with respect to the *need* for the 2001 Policy. According to plaintiffs, prior to issuance of the Policy, Hartford filed a prospectus with the SEC for its Stag Variable Life Last Survivor policies in which Hartford "explained the very IRS Notice provisions at issue here." As for

Ricken, it is alleged that he was an experienced life insurance salesman who was an officer of AIMS, which holds itself out as an expert consultant on the use of life insurance policies in split-dollar arrangements, and the tax implications thereof. In addition, AIMS prepared a discussion memorandum on the IRS Notice that Ricken provided to both AIMS's and Kohn's clients. The memorandum does not indicate that the IRS Notice requires the purchase of a new insurance policy to take advantage of its provisions. In sum, plaintiffs allege that "no reasonable life insurance agent or insurance consultant could read the IRS Notice" to require a new policy.

With respect to the allegations of scienter related to the *costs* of the Policy, plaintiffs allege that Hartford, Ricken and AIMS all were familiar with the comparative costs of the 1998 and 2001 Hartford policies, and thus had knowledge that their representations that the 2001 Policy would be cheaper were patently false.

In addition, with regard to misrepresentations of both the need for, and the costs of, the 2001 Policy, plaintiffs allege that Hartford had a motive for its misrepresentations in the "enormous amount of sales" that would be generated if the IRS Notice was represented to require that all insured purchase new policies in order to take advantage of the tax treatment afforded by the Notice. Plaintiffs point to the spike in Hartford's post-

Notice 2001 variable life insurance sales that was due in part to sales of policies associated with split-dollar arrangements.

It is alleged that Kohn and Ricken were similarly motivated to induce plaintiffs to purchase the 2001 Policy because they stood to receive substantial commissions for themselves and AIMS.

**E.      The Third Amended Complaint**

Plaintiffs filed their original complaint on May 31, 2002. Less than one week later, and prior to defendants' filing a response, plaintiffs filed an amended complaint. Subsequent to defendants' filing of motions to dismiss, plaintiffs, with leave of court, filed its Second Amended Complaint ("the SAC"). We granted, without prejudice, defendants' motions to dismiss the SAC for failure to meet the pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) ("the PSLRA").

Plaintiffs have now filed a seven-count Third Amended Complaint alleging: a "false statement" claim for violation of § 10(b) of the Securities Exchange Act of 1934 ("§ 10(b)") and SEC Rule 10(b)(5) against Hartford, Ogilvie, Ricken and AIMS (Count I); a "churning" claim for violation of § 10(b) against Ogilvie, Ricken and AIMS (Count II); a "control person" claim for violation of § 20(a) of the Exchange Act against Hartford and Ogilvie (Count III); a common law fraud claim against all defendants (Count IV); an Illinois Consumer Fraud and Deceptive Practices Act (815 ILCS §

505/2) claim against all defendants (Count V); a Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-105) claim against all defendants (Count VI); and a legal malpractice claim against Kohn (Count VII). Defendants have moved to dismiss the TAC in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b).[3]

## STANDARD OF REVIEW

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Hentosh v. Herman M. Finch Univ. of Health Sciences, 167 F.3d 1170, 1173 (7th Cir. 1999); Jang v. A.M. Miller & Assocs., 122 F.3d 480, 483 (7th Cir. 1997). Dismissal is appropriate only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir. 1997) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); Jones v. General Elec. Co., 87 F.3d 209, 211 (7th Cir.), cert. denied, 519 U.S. 1008 (1996).

---

[3]On May 5, 2004, we denied Ogilvie's motion to dismiss as raising issues that go beyond the pleadings.

The standard of review under Rule 9(b) is more stringent. Rule 9(b) requires a plaintiff to plead with particularity the factual basis for averments of fraud, including: "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997). Put simply, Rule 9(b) particularity "means the who, what, when, where and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).

In addition, plaintiffs' allegations brought under the federal securities laws are subject to the strictures of the PSLRA. The PSLRA requires the complaint to "specify each statement alleged to have been misleading," and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Further, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2).

## DISCUSSION

A.      **Sufficiency of the Allegations Under Rule 9(b) and the PSLRA**

Each of plaintiffs' claims arise from defendants' alleged misrepresentations in two general categories: the need for the 2001 Policy and the costs of the Policy. Defendants argue that

plaintiffs have failed to plead those misrepresentations with the specificity required by Rule 9(b). We disagree. Plaintiffs have sufficiently alleged the particulars – the "who, what, when, where and how" – of the alleged misrepresentations by Kohn, Ricken and AIMS to give defendants a meaningful opportunity to respond. There are no allegations that Hartford made any misrepresentations directly to plaintiffs. Rather, it is alleged that Hartford made its misrepresentations to Kohn, Ricken and/or AIMS with the knowledge that the misrepresentations would be passed on to plaintiffs. Plaintiffs, however, cannot be expected, at this juncture, to know the specifics of Hartford's agents' communications with Kohn, Ricken and/or AIMS. Information that might allow a more particularized pleading is exclusively in defendants' possession. Accordingly, the allegations against Hartford fall within the exception to Rule 9(b) that allows further particulars to be obtained by discovery. See Emery v. American General Finance, 134 F.2d 1321, 1323 (7th Cir. 1998); Petri v. Gatlin, 997 F.Supp. 956, 974 (N.D.Ill. 1997).

Defendants also contend that plaintiffs' § 10(b) securities fraud claims, alleged in Counts I and II, fail to meet the pleading requirements for scienter under the PSLRA. The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter under section 10(b)

is "the intent to deceive, manipulate or defraud," <u>Ernst & Ernst v.</u>
<u>Hochfelder</u>, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668
(1976), and includes "reckless disregard for the truth of the
material asserted." <u>SEC v. Jakubowski</u>, 150 F.3d 675, 681 (7th Cir.
1998). "Reckless conduct is, at least, conduct which is highly
unreasonable and which represents an extreme departure from
standards of ordinary care . . . to the extent that the danger was
either known to the defendant or so obvious that the defendant must
have been aware of it." <u>Rehm v. Eagle Fin. Corp.</u>, 954 F.Supp. 1246,
1255 (N.D. Ill. 1997).

The Seventh Circuit has yet to articulate a standard for
determining the sufficiency of scienter allegations under the
PSLRA. Absent such guidance, several courts in this district have
adopted the Second Circuit's standard, which requires plaintiff to
allege either: (i) facts showing that the defendant had both the
motive and opportunity to commit fraud, or (ii) facts constituting
strong circumstantial evidence of conscious misbehavior or
recklessness. <u>See</u>, <u>e.g.</u>, <u>Fishman v. Meinen</u>, 2003 WL 444223, at *5
(N.D. Ill. Feb. 24, 2003); <u>In re Hartmarx Securities Litigation</u>,
2002 WL 653892, at *2 (N.D. Ill. April 19, 2002). As we noted in
our order dismissing the Second Amended Complaint, these modes of
pleading do not carry any "talismanic significance" - that is,
whether a plaintiff takes the "motive and opportunity,"
"circumstantial evidence," or some other approach is less important

than whether the allegations support a strong inference that defendant knew, or was at least reckless in not knowing, that its alleged misrepresentations were false. See Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001) ("In enacting the PSLRA, Congress was concerned with the quantum, not type, of proof.").

We first take up plaintiffs' allegations of scienter with respect to the need for the Policy. On this front, the parties devote considerable attention to whether the IRS Notice, in fact, did require plaintiffs to purchase a new life insurance policy in order to take advantage of its newly-authorized tax treatment for loan split-dollar arrangements. But questions of whether the IRS Notice required a new policy and whether that would have been clear to counsel and investment advisers are not before us; those questions await development of the record. At this procedural phase, we take as true plaintiffs' allegation that the IRS Notice did *not* require the purchase of a new policy. Our "scienter" inquiry is simply whether we can draw a strong inference from plaintiffs' allegations that Hartford, Ricken and AIMS knew, or were reckless in not knowing, that a new policy was not required. Plaintiffs allege that Hartford, Ricken and AIMS are all experts in the use of life insurance policies in split-dollar arrangements, and the tax implications thereof. According to plaintiffs, Hartford filed an SEC prospectus, and Ricken and AIMS prepared a client memorandum, both discussing the tax implications of the IRS

Notice. It is alleged that Hartford, Ricken and AIMS were all intimately involved in advising plaintiffs on their investment needs in light of the Notice. Plaintiffs also allege that Hartford was motivated to induce plaintiffs to purchase the 2001 Policy because of the substantial premiums it would receive, and that Ricken was similarly motivated because he stood to receive substantial commissions for himself and AIMS. Plaintiffs point to the spike in Hartford's 2001 variable life insurance sales due in part to its sales of policies associated with split-dollar arrangements. Taken together, plaintiffs have pled sufficient facts to draw a strong inference – again, assuming the Notice did not require a new policy – that defendants were at least reckless in representing otherwise.

With respect to the costs of the 2001 Policy, plaintiffs allege that Hartford, Ricken and AIMS were all familiar with the comparative costs of the 1998 and 2001 Hartford policies, and thus had knowledge that their representations that the 2001 Policy would be cheaper were false. Assuming, as we must, that the 2001 Policy in fact was more expensive than represented, plaintiffs have met their burden of pleading scienter.

Of course, whether Hartford, Ricken and AIMS actually acted with the requisite scienter remains an issue of fact to be decided at a later stage of the litigation, but as a matter of pleading, plaintiffs have sufficiently alleged scienter on the part of

Hartford, Ricken and AIMS to sustain a claim under 10(b).

**B.      Failure to State a Claim Pursuant to Rule 12(b)(6)**

The remainder of defendants' arguments are brought under Rule 12(b)(6). We begin with two arguments which are addressed to all counts, and then will proceed to the arguments on the individual counts.

First, defendants argue that their statements concerning the Notice are statements of law, and as such, cannot form the basis of a claim for misrepresentation. The court is familiar with the doctrine that misrepresentations of law generally are not actionable, but the concept's continued viability is, at best, on shaky ground. See Atwell v. Lisle Park District, 286 F.3d 987, 991 (7th Cir. 2002) ("This 'equal access' theory is unrealistic, though not as unrealistic as grounding a principle that misrepresentations of law are not actionable in the hoary maxim – a testament to the embarrassing tenacity of legal fictions – that everyone is presumed to know the law.") (citation omitted); Zimmerman v. Waste Ltd., II, 1997 WL 159188, at *4 (N.D.Ill. Mar. 28, 1997) ("[T]hat misrepresentations of law cannot be the grounds for a fraud action . . . is a notion, however, that seems to be on the wane. . . ."); Prosser and Keeton, Torts § 109 (5th ed. 1984) (The "present tendency is strongly in favor of eliminating the distinction between [misrepresentations of] law and facts as useless duffle of an older and more arbitrary day" and toward "recognizing that a

statement as to the law, like a statement as to anything else, may be intended and understood either as one of fact or one of opinion only, according to the circumstances of the case.") (alteration added). And even if the rule does retain some viability, we decline to hold, on a motion to dismiss, that defendants' alleged fraudulent statements regarding the need for the 2001 Policy under the Notice can only be properly characterized as misrepresentations of law. Attaching a label to each misrepresentation, *i.e.*, as one of law or of fact (again, to the extent such an exercise is legally relevant), would be premature absent further factual development.

Defendants' second argument is that the alleged misrepresentations of the Policy's costs are not actionable because plaintiffs could not have reasonably relied on them. The 2001 Policy, defendants argue, is an integrated contract which disclosed all of the fees, charges and restrictions on cash withdrawals. Plaintiffs respond that the Policy does not expressly provide a list of *absolute* charges, but rather a range of *potential* charges, and therefore defendants' representations did not contradict the terms of the Policy. We find defendants' position less than compelling, but issues of whether reliance was "reasonable" or "justified" are questions of fact, see <u>Gelco Corp. v. Duval Motor Co.</u>, 2002 WL 31875537, at *5 (N.D. Ill. Dec. 26, 2002), and because it is *possible* that plaintiffs will be able to prove reasonable reliance under some set of facts consistent with the

complaint, they should have an opportunity to do so.

We turn now to the arguments proffered by defendants on the individual counts. Because most of the arguments go to the merits, rather than the sufficiency of the TAC, they can be resolved with relative ease.

Count II alleges a § 10(b) claim for "churning" against Ricken and AIMS and alleges that by selling an unnecessary policy, these defendants engaged in "'excessive activity" in Stephenson's brokerage account "for the purpose of generating a commission." (Compl., ¶ 116.) Defendants move to dismiss this count on the ground that a "churning" claim cannot be based on a single transaction. Although it is true that a "churning" claim typically involves multiple transactions, it may also be based on a single transaction. See IDS Life Ins. Co. v. Royal Alliance Assoc., Inc., 266 F.3d 645, 652 (7th Cir. 2001) ("churning" in the life insurance context is "trying to persuade an insured to replace his existing policy . . . with a new policy"); In re. Prudential Ins. Co. of America Sales Practice Litig., 261 F.3d 355, 359 n. 2 (3d Cir. 2001). Accordingly, Count II states a claim.

Count III is brought under § 20(a) of the Exchange Act alleging control person liability against Hartford by virtue of its relationship with Ricken and AIMS. Control person liability is established under § 20(a) when the defendant (i) "actually participated in, that is, exercised control over, the operations of

the person in general," and (ii) "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 614 (7th Cir. 1996). Hartford moves to dismiss this count, arguing that plaintiffs' allegations that Ricken and AIMS are exclusive agents of Hartford is false. According to Hartford, Ricken and AIMS are not its exclusive agents and are free to sell products for other insurers. This is a fact question. Moreover, it is well-settled that § 20(a) is broader than agency principles and imposes liability on those "individuals who 'control' persons committing security frauds, but who otherwise would escape liability" because no agency relationship exists. Pershing v. Sirmer, 1989 WL 165155, at *5 (N.D. Ill. Dec. 27, 1989). In any event, plaintiffs allege the existence of an agency agreement which at least raises the inference that Hartford had general control over Ricken's sale of Hartford policies and the ability to control Ricken and AIMS's conduct in the sale of the 2001 Policy. Count III will stand.

Counts V and VI allege claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") and the Colorado Consumer Protection Act ("CCPA"), respectively. On the ICFA claim, defendants contend that plaintiffs have failed to allege a "consumer nexus," that is, trade practices addressed to the public generally or otherwise implicating consumer protection

concerns.  See _Athey Prods. Corp. v. Harris Bank Roselle_, 89 F.3d 430, 436 (7th Cir. 1996).  First off, it is not even clear that plaintiffs, "consumers" under the Act, must plead a "consumer nexus."  See, _e.g._, _Lefebvre Intergraphics, Inc. v. Sandan Mach. Ltd._, 946 F.Supp. 1358, 1368 (N.D. Ill. 1996) (the test "applies only to a Consumer Fraud Act action by a business that is not a consumer of the other business's products").  And if a "consumer nexus" is required, plaintiffs have alleged sufficient allegations to make out a proper claim.  "It is well-settled that the sale of insurance is a service to which the protections of the [ICFA] apply."  _P.I.A. Michigan City, Inc., v. Nat'l Porges Radiator Corp._, 789 F.Supp. 1421, 1426 (N.D. Ill. 1992).  Plaintiffs' allegations that defendants used an IRS notice to induce plaintiffs to purchase an unnecessary insurance policy in order to generate sales, and further, that similar sales to others are reflected in the surge of Hartford's variable life insurance sales following issuance of the Notice, on their face, implicate consumer protection concerns.  Whether plaintiffs will be able to _prove_ that defendants' trade practices were directed at the market generally is another question, but the allegations are sufficient to survive a motion to dismiss.

Defendants make a similar argument under the Colorado Consumer Protection Act, namely that plaintiffs have not alleged a sufficient "consumer impact."  See _Rhino Linings USA, Inc. v. Rocky_

Mountain Rhino Lining, Inc., 62 P.3d 142, 146-147 (Colo. 2003). Again, to begin with, the CCPA applies to conduct relating to the sale of insurance policies. See Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d 47, 49, 58 (Colo. 2001) ("[B]ecause deceptive or unfair practices in the business of insurance could clearly injure the public they are within the purview of the CCPA."). For the same reasons stated as to the ICFA claim, defendants' motions to dismiss the CCPA claim are denied.

Kohn raises an additional argument in support of dismissal of the ICFA claim as to him. Specifically, he asserts that the ICFA does not apply to attorneys providing legal services to their clients. The Supreme Court of Illinois has made clear that the ICFA does not apply to an attorney for conduct "arising out of the attorney-client relationship." Cripe v. Leiter, 703 N.E.2d 100, 104 (Ill. 1998). "[T]he legislature did not intend for the Act to apply to attorney conduct because unlike ordinary merchant-customer relationships, the attorney-client relationship in Illinois is already subject to extensive regulation." Shaffer v. Respect, Inc., 1999 WL 281345, at *6-7 (N.D. Ill. Mar. 31, 1999). It is not yet clear, however, whether Kohn's allegedly unlawful conduct was solely in his capacity as an attorney representing Kohn. For example, many of the allegations in the complaint relate to Kohn in a business capacity, either as an undisclosed agent of Hartford or as Chairman of AIMS. Accordingly, because we cannot hold as a

matter of law that any actionable conduct by Kohn was necessarily in his capacity as an attorney, the ICFA claim survives as to him as well.

Finally, Count VII raises a legal malpractice claim against Kohn, asserting that he breached his fiduciary duty of care in connection with his advice to plaintiffs regarding the purchase of the 2001 Policy, and that he breached his fiduciary duty of loyalty by failing to disclose to plaintiffs his involvement with Hartford and AIMS. The elements of a legal malpractice claim are (i) the existence of an attorney-client relationship; (ii) a duty from that relationship; (iii) a breach of that duty on the part of the attorney; (iv) proximate cause; and (v) damages. See <u>Kirkland & Ellis v. CMI Corp.</u>, 1996 WL 559951, at *6 (N.D. Ill. Sep. 30, 1996). Kohn challenges plaintiffs' ability to prove proximate cause and damages. Neither argument merits discussion. Suffice it to say, plaintiffs have averred specific damages, and under the allegations in the TAC, which we must take as true, they may be able to demonstrate that those damages were proximately caused by Kohn's legal advice. Kohn's motion to dismiss Count VII is therefore denied.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the Third Amended Complaint are denied. Discovery is to proceed forthwith. A status hearing is set for November 3, 2004 at 11:00.

DATE:    September 30, 2004

ENTER:   _____

         John F. Grady, United States District Judge