**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RICHARD J. STEPHENSON, STEPHENSON    )
MASTER LP, STEPHENSON/ZION            )
INSURANCE TRUST, MIDWESTERN           )
REGIONAL MEDICAL CENTER, INC.,        )
CANCER TREATMENT CENTERS OF           )
AMERICA, INC., and ZION               )
HEALTHCARE PROPERTIES,                )
                                      )
            Plaintiffs,               )
                                      )
        v.                            )
                                      )   No. 02 C 3917
HARTFORD LIFE AND ANNUITY             )
INSURANCE COMPANY, HARTFORD LIFE,     )
INC., HARTFORD LIFE INSURANCE         )
COMPANY, INC., OGILVIE SECURITY       )
ADVISORS CORP., MICHAEL E. KOHN,      )
GERALD D. RICKEN, APPLIED             )
INNOVATIVE MONETARY SOLUTIONS, LLC,   )
ELAR PARTNERS III LLC, and WINDSOR    )
INSURANCE ASSOCIATES, INC.,           )
                                      )
            Defendants.               )

**MEMORANDUM OPINION**

Before the court is Plaintiffs' Motion for Leave to File a Fourth Amended Complaint in this securities action. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND[1]

### A. The Parties

This action arises out of the 2001 purchase of a variable life insurance policy ("the 2001 Policy" or "the Policy") insuring plaintiff Richard J. Stephenson. In addition to Stephenson, plaintiffs are several of his related partnerships and corporations: Stephenson Master LP, an Illinois limited partnership of which Stephenson is the limited partner; Stephenson/Zion Insurance Trust, an Illinois trust and owner and beneficiary of a 1998 life insurance policy covering Stephenson ("the 1998 Policy"); Midwestern Regional Medical Center, Inc. ("MRMC"), an Illinois corporation of which Stephenson is the Chairman and a shareholder, and Cancer Treatment Centers of America, Inc. ("CTCA"), another Illinois corporation, of which Stephenson is the Chairman and sole shareholder. Zion Healthcare Properties ("ZHP") is a wholly-owned subsidiary of MRMC and is an Illinois Chapter S corporation. ZHP has paid premiums for the 1998 Policy, directly or indirectly, through MRMC.

Defendant Hartford Life and Annuity Insurance Co. ("HLA"), a Connecticut company and subsidiary of defendants Hartford Life, Inc. ("HLI") and Hartford Life Insurance Co., Inc. ("HLIC") (collectively, "Hartford"), issued the 1998 and 2001 Policies.

---

[1]The following facts are drawn from the proposed Fourth Amended Complaint ("FAC"). Our summary omits language such as "plaintiffs allege."

Defendant Michael Kohn is a Missouri lawyer, specializing in tax law, and served as plaintiffs' tax lawyer from 1997 through May 2002. Defendant Gerald Ricken is an insurance salesman, licensed in Illinois and Colorado, who had an agency agreement with Hartford. Defendant Applied Innovative Monetary Solutions, LLC ("AIMS") is a Missouri company through which Kohn and Ricken conducted business. On information and belief, Kohn was the Chairman and founder of AIMS, and Ricken was its President and CEO. On information and belief, Kohn and Ricken shared the costs of, and income generated by, AIMS. Kohn and Ricken are brothers-in-law and shared office space.

Defendant Ogilvie Security Advisors Corp. is an Illinois broker-dealer and member firm of the National Association of Securities Dealers ("NASD"). Ricken was an NASD-registered representative and broker of Ogilvie. Thus, Ricken conducted his business as a broker of Ogilvie, through AIMS, and, on information and belief, contributed his commissions from the sale of Hartford variable life insurance policies to AIMS.

On information and belief, defendant ELAR Partners III LLC ("ELAR") is an Arizona Limited Liability Company, which operates as a life insurance producers group. Defendants AIMS and Windsor Insurance Associates, Inc. are investors in and members of ELAR, as are Ricken and Kohn (by virtue of their affiliation with AIMS). At all relevant times ELAR was a general agent of HLA and HLIC. ELAR

also had an agreement with HLA and HLIC to "enhance the profitability" of any life insurance written by Hartford and sold by investors and/or members of ELAR, and to share in any profits of certain insurance products sold by members of ELAR, including the 2001 Policy.

On information and belief, defendant Windsor Insurance Associates, Inc. ("Windsor"), is a California corporation and independent national life insurance marketing firm. At all relevant times Windsor was a general agent of Hartford and had an agreement with HLA and HLIC whereby Windsor, in connection with the sale of certain insurance products offered by Hartford, provided a variety of services in return for the payment of commissions and or service fees on the sale of such policies. Windsor also promotes Hartford's insurance products and supplies Hartford's marketing materials to outside sales agents in order to give them ideas on ways to use these products. Windsor also is an investor in and member of ELAR. Jerome J. Schwartz and/or Marc P. Schwartz were the principals of both Windsor and ELAR, which share offices.

**B.**   **The 1998 Policies**

In 1998, Stephenson Master, Stephenson/Zion, MRMC and CTCA purchased two variable life insurance policies insuring Stephenson. The first policy, issued by Hartford, insured Stephenson in the amount of $13 million ("the 1998 Hartford Policy"). The second

policy, issued by American General Life Insurance Company, insured Stephenson in the amount of $27 million ("the American General Policy"). Together, the 1998 policies provided Stephenson with $40 million in coverage. Stephenson/Zion is the owner and beneficiary of the 1998 Hartford Policy and Stephenson Master is the owner and beneficiary of the American General Policy.

Based on Kohn's advice, plaintiffs structured split-dollar and collateral assignment agreements for each of the 1998 policies, under which MRMC is the assignee of the 1998 policies and MRMC, CTCA, Stephenson/Zion and/or Stephenson Master pay the premiums.[2]

## C. **The 2001 Policy**

On January 27, 2001, the Internal Revenue Service clarified its prior rulings regarding the taxation of split-dollar life insurance arrangements and provided taxpayers with interim guidance on the requirements for such tax treatment in IRS Notice 2001-10, 2001-5 I.R.B. 549 ("the IRS Notice" or "the Notice"). The Notice provided, _inter alia_, that an employer's payments under a

---

[2] A split-dollar arrangement is a contractual agreement under which an employer contracts with its employee to pay some or all of the annual premiums on a life insurance policy for the employee and the employer and employee split the policy benefits. Under a collateral assignment split-dollar arrangement, the employee is formally designated as the owner of the policy and pays the entire premium, while the employer in form makes annual loans, without interest (or below the fair rate of interest) to the employee of amounts not to exceed the annual premiums. The employee executes an assignment of the policy to the employer as collateral security for the loans, which are generally payable upon the termination of employment or the death of the employee. (See Fourth Amended Complaint, ¶ 28 (citing IRS Ruling 64-328.)

split-dollar arrangement could be characterized as loans for tax purposes, and set forth guidelines for determining the characterization and tax treatment of such loan split-dollar arrangements.

On January 10, 2001, Hartford's Individual Life Estate and Business Planning group issued a bulletin to all of its field staff, including Windsor, and on information and belief, Ricken, AIMS and Kohn, outlining the details of the IRS Notice. The bulletin emphasizes that the field staff "should keep in mind that <u>change presents opportunity</u> for you to be of service to those producers and advisors who rely on you for expertise." FAC, ¶ 31 (emphasis in original). On January 12, 2001 Hartford issued another bulletin to all of its field staff, including Windsor, which provided Hartford's interpretation of the potential impact of the IRS Notice. On information and belief Windsor distributed the bulletin to Hartford's outside agents, including Ricken, AIMS and Kohn.

Shortly after issuance of the IRS Notice, Hartford, Kohn, Ricken, AIMS, ELAR and Windsor approached plaintiffs and represented that the IRS Notice required the purchase of a new universal variable life insurance policy, and further, that plaintiffs could achieve substantial cost savings by replacing the 1998 policies with a new policy.

In May 2001, Kohn, Ricken, AIMS, Ogilvie, ELAR and Windsor

arranged with Hartford for the issuance and sale of the 2001 Policy, also a Hartford policy, which insured Stephenson in the amount of $42 million. Windsor was the intermediary through which Ricken submitted the application materials. Windsor then submitted the materials to Hartford's ELAR Unit, which was created to service ELAR policies. Hartford issued the 2001 Policy as a Colorado policy on or about May 22, 2001. Ricken sold the 2001 Policy to plaintiffs through Windsor, Ricken, AIMS and Kohn (by his affiliation with AIMS), all members of ELAR, and as a registered representative and broker of Ogilvie. Hartford backdated the Policy one year, giving it an effective date of May 20, 2000.

### D.   **Alleged Misrepresentations**

Between February and June 2001, Hartford, Kohn, Ricken, AIMS, ELAR and Windsor engaged in oral and written communications with each other relating to the 2001 Policy. Through their communications, Hartford representatives – including one or more "high-level" executives, product designers, internal actuaries, and attorneys – made the following representations to Kohn, Ricken and/or AIMS: (i) plaintiffs had to purchase a new universal variable life insurance policy with $42 million in coverage to meet their life insurance, tax, and investment objectives under the IRS Notice; (ii) the total costs (including sales charges and premium tax costs) of the 2001 Hartford Policy would be 60% less than the

costs that plaintiffs were incurring under the 1998 policies; (iii) plaintiffs could make up to $4 million in annual "unscheduled premium payments" and then withdraw or "pass through" up to $4 million without payment of any costs under the 2001 Policy; and (iv) plaintiffs were required to reduce the coverage on Stephenson under the American General Policy from $27 million to $3 million, and cancel the 1998 Hartford Policy, as preconditions to issuing the 2001 Policy. According to plaintiffs, Hartford knew or should have known that Kohn, Ricken, and/or AIMS would communicate these representations to plaintiffs. Alternatively, plaintiffs allege, on information and belief, that Hartford directed them to do so.

ELAR, Windsor, Kohn, Ricken and/or AIMS did convey Hartford's representations to plaintiffs in numerous in-person meetings, correspondence and telephone conversations between February and June 2001. During these discussions, Kohn, Ricken and/or AIMS attributed the statements to Hartford. In addition, Kohn, Ricken and/or AIMS made further representations of their own. Specifically, on either February 1 or 2, 2001, at the AIMS office in St. Louis, Missouri, Kohn described the proposed 2001 Policy to Phillip Picchietti, CFO of MRMC and CTCA and a financial adviser to Stephenson and his family, and to Stephen Bonner, CEO of CTCA, who joined in the meeting by telephone. Then, on February 2, 2001, Kohn presented the 2001 Policy proposal to Stephenson in a face-to-face meeting. Others present at the February 2 meeting

included Picchietti, Dennis Lynde (Tax Director of MRMC and CTCA), and Michael Coulter Smith, an MRMC boardmember and Trustee of Stephenson/Zion and Stephenson Master.

At these meetings, it was represented to plaintiffs that: (i) the IRS Notice required plaintiffs to purchase a new life insurance policy to obtain the tax treatment authorized by the Notice, and to achieve their other investment and life insurance objectives; (ii) Hartford offered such a policy; and (iii) plaintiffs "could not use their existing 1998 policies under the IRS Notice." Kohn repeated these representations during a February 16, 2001 telephone conference with Picchietti, Lynde and Bonner and others. Then, at a March 1, 2001 meeting with Picchietti, Lynde and Smith, again at AIMS's office, Kohn and Ricken made the following representations: (i) the Notice required plaintiffs to purchase a new policy, with approximately $40 million in coverage, for plaintiffs to obtain the tax treatment authorized by the Notice, and to achieve their other investment and life insurance objectives, including the ability make up to $4 million in annual "unscheduled premium payments" and then withdraw or "pass through" up to $4 million without payment of any costs; (ii) the policy terms and tax benefits-including the absence of costs on unscheduled premiums-were possible only "because of the tax treatment recently approved in the IRS Notice and because of a new type of policy being offered by Hartford"; (iii) plaintiffs would have to reduce the coverage under the

American General Policy and cancel the 1998 Hartford Policy; and (iv) the total costs of purchasing the 2001 Policy would be "much lower" than plaintiffs' costs under the 1998 policies.

Also during the March 1 meeting, Picchietti was provided with "Hartford Policy illustrations" dated February 28, 2001 and March 1, 2001 representing again, *inter alia*, that $4 million could be "passed through" the Policy free of charge. The Hartford illustrations were provided to Ricken by Cliff Barron in Hartford's Product Management Department. Hal Brooks of Windsor was copied on these illustrations. Ricken repeatedly referred to Brooks as his "Hartford contact" in communications with plaintiffs.

Thereafter, in a March 7, 2001 letter to Stephenson, Kohn stated that "high-level" individuals at Hartford, as well as Kohn and Ricken, had designed and structured the 2001 Policy to meet plaintiffs' objectives, that "no one has ever structured such a platform," and that "legal representatives at the Hartford" had provided Kohn with "Arthur Andersen's analysis" of the proposed transaction. The March 7 letter also detailed the proposed plan for plaintiffs' purchase of the 2001 Policy, and expressly represented the following:

> Because IRS Notice 2001-10 requires a new policy be acquired after the date of the Notice, we requested of Hartford that they absorb any costs or surrender charges in connection with exchanging the existing policy for a new policy. We cannot use any existing policy ... The [1998] Hartford Policy will be exchanged for the new policy.

Kohn also represented that Hartford had agreed to back-date the

policy to allow plaintiffs to pass the entire $4 million of unscheduled premium through to Stephenson "without any costs or commissions or loads of any kind" and to reduce the amount of death benefit plaintiffs had to purchase.

In a subsequent letter to Stephenson dated April 10, 2001, on which Picchietti, Lynde and Smith were copied, Kohn represented that the American General Policy could not be used in a loan split-dollar agreement because such treatment "is only afforded to policies acquired after the date of the Notice (January 16, 2001)."

Then, during a conference call with Stephenson and Picchietti on or about May 17, 2001, Kohn summarized the steps necessary to implement the purchase of the 2001 Policy and to allow plaintiffs to make a total of $8 million in unscheduled premium payments and withdrawals between June 2001 and June 2002 "free of any tax loads, or commissions."

Days later, in an e-mail dated May 30, 2001 from Ricken to Picchietti, Ricken directed plaintiffs to make the first monthly premium payment for the 2001 Policy on May 31, 2001. In this e-mail, Ricken also assured plaintiffs that he would work directly with Hal Brooks of Hartford to ensure that Hartford was ready for CTCA's $4 million unscheduled premium payment and Stephenson's $4 million withdrawal, both to occur on May 31, 2001. However, despite defendants' repeated representations that unscheduled premium payments would be "passed through" free of charge, Hartford

levied approximately $500,000 in commissions, premium costs, surrender charges, and other costs or loads on the withdrawal. Hartford refused to refund any of these charges to plaintiffs.

The 2001 Policy provided for a "free-look" period in which plaintiffs had twenty days from the date of receipt to rescind the Policy. During this "free-look" period, which began on May 31, 2001 and ended June 19, 2001, defendants made further misrepresentations to plaintiffs. Following Hartford's $500,000 charge on Stephenson's May 31 withdrawal, Picchietti and Smith, in e-mail correspondence to Kohn and Ricken dated June 1 and 4, 2004, demanded that defendants confirm the total premiums, costs, loads and other charges to be incurred under the 2001 Policy. They also insisted that future unscheduled premiums be free of charges of any kind, and demanded an explanation for the May 31 charge.

In response, on or about June 1, 2001, Ricken and Kohn provided Picchietti with a Hartford Policy Illustration dated June 1, 2001, which again purported to show that plaintiffs' costs and expenses under the 2001 Policy would be substantially lower than those under the 1998 policies. In subsequent correspondence, including a letter dated June 5, 2001 from Kohn to Picchietti, and copying Stephenson, Lynde and Smith, defendants represented to plaintiffs: (i) that Hartford "will guarantee in writing that the next Four Million Dollars ($4,000,000) will flow as represented" and that future withdrawals of unscheduled premium payments would

not be subject to charges; (ii) that by merging the 1998 Hartford Policy into the 2001 Policy, the surrender charges for the 1998 Hartford Policy would be "moved" to the new 2001 Hartford Policy and plaintiffs would not pay charges for cancellation of the 1998 Hartford Policy; and (iii) the "entire cost of the [new] insurance would be less than 10%-15% of what is being paid annually now for less insurance." Finally, in a June 6, 2001 letter from Kohn to Picchietti, with copies to Stephenson, Lynde and Smith, Kohn warned that "it would be wasteful and ill-advised to reverse course now."

According to plaintiffs, and contrary to defendants' representations, the IRS Notice did not require that a new life insurance policy be purchased, i.e., one issued after the release of the IRS Notice, in order to be used in a loan split-dollar arrangement. The requirements of the Notice, according to plaintiffs, "are clear and obvious to anyone, especially those in the tax or life insurance industry." Further, the total costs of the 2001 Hartford Policy were, in fact, higher than the costs under the 1998 policies. Plaintiffs have incurred costs in excess of $1.3 million more than what they would have incurred under one or both of the 1998 policies. Included in this amount are surrender charges that are still in effect on the 1998 Hartford Policy, which has not been cancelled, as well as charges imposed by Hartford on the withdrawals plaintiffs have made on the 2001 Policy.

Plaintiffs allege that all of defendants' misrepresentations

were made to induce plaintiffs to purchase the 2001 Policy. Plaintiffs aver that they in fact did rely on defendants' representations in deciding to purchase the 2001 Policy, and had they known that the IRS Notice did not require the purchase of a new policy and that the costs of the new policy would exceed those associated with the 1998 policies, they would not have made the purchase.

In addition, plaintiffs allege, on information and belief, that in making these representations, Kohn acted not only as plaintiffs' tax attorney, but also as an "undisclosed agent" of Hartford. Pursuant to his sales agreement with Hartford, Kohn is an authorized agent of the company for the solicitation and procurement of applications for insurance contracts. On information and belief, Hartford authorized Kohn to act on its behalf in selling the 2001 Hartford Policy. Kohn also acted as an agent of Hartford by working with Ricken, who was an "exclusive agent" of Hartford, to facilitate plaintiffs' purchase of the 2001 Policy. Kohn also acted as an undisclosed agent of ELAR pursuant to his ownership interest through AIMS' membership in ELAR, which entitled him to share in the profits of the 2001 policy. On information and belief, Kohn and Ricken received substantial commissions of approximately $600,000 from Hartford, and directly or indirectly through AIMS, for their work in selling the 2001 Policy.

On information and belief, pursuant to its agency relationship with Ricken, Hartford paid Ricken substantial commissions for the sale of the 2001 Policy, at least some of which Ricken contributed to AIMS. Ricken also acted in his capacity as an agent of ELAR pursuant to his membership interest in ELAR (through AIMS), which entitled Ricken to share in additional profits. Ricken also acted in his capacity as a registered representative, broker and agent of Ogilvie in making material misrepresentations and omissions to plaintiffs. On information and belief, pursuant to its agreement with Windsor, Hartford exercised control over Windsor and/or had the ability to exercise control over Ricken and AIMS.

## E.    Allegations of Scienter

Plaintiffs allege generally that defendants acted with scienter in that their misrepresentations were made either with knowledge that they were false and/or in reckless disregard of their falsity: defendants "failed to ascertain and to disclose the true facts to Plaintiffs, even though such facts were available to them." We begin with the allegations of scienter with respect to the need for the 2001 Policy. According to plaintiffs, prior to issuance of the Policy, Hartford filed a prospectus with the SEC for its Stag Variable Life Last Survivor policies in which Hartford "explained the very IRS Notice provisions at issue here." Plaintiffs further allege that Hartford, as the third largest

insurance group in the United States, is an expert in the area of variable life insurance and had full knowledge of the tax provisions relating to split-dollar arrangements involving life insurance policies.

With regard to Ricken and AIMS, plaintiffs allege that Ricken was an experienced life insurance salesman who was an officer of AIMS, which holds itself out as an expert consultant on the use of life insurance policies in split-dollar arrangements, and the tax implications thereof. In addition, AIMS prepared a discussion memorandum on the IRS Notice that Ricken provided to both AIMS's and Kohn's clients. The memorandum does not indicate that the IRS Notice requires the purchase of a new insurance policy to take advantage of its provisions. In sum, "no reasonable life insurance agent or insurance consultant could read the IRS Notice" to require a new policy.

With respect to the allegations of scienter related to the costs of the Policy, Hartford, Ricken and AIMS all were familiar with the comparative costs of the 1998 and 2001 Hartford policies, and thus had knowledge that their representations that the 2001 Policy would be cheaper were patently false.

In addition, with regard to misrepresentations of both the need for, and the costs of, the 2001 Policy, Hartford had a motive for its misrepresentations in the "enormous amount of sales" that would be generated if the IRS Notice was represented to require

that all those insured purchase new policies in order to take advantage of the tax treatment afforded by the Notice. Plaintiffs point to the spike in Hartford's post-Notice 2001 variable life insurance sales that was due in part to sales of policies associated with split-dollar arrangements.

Plaintiffs also allege that Ogilvie either had actual knowledge of the misrepresentations and omissions of material facts or acted with reckless disregard of the truth. Ogilvie's registered representative, Ricken, acted with scienter at all times. Furthermore, Ogilvie is a sophisticated NASD broker-dealer specializing in the sale of variable life insurance policies. As such, Ogilvie knew that such policies are used in split-dollar arrangements, and certainly had actual knowledge of the tax provisions applicable to such arrangements.

Further, Windsor either had actual knowledge of the misrepresentations and omissions of the material facts or acted with reckless disregard of the truth. Windsor is an experienced marketing organization that had been promoting Hartford's insurance products and supplying sales and marketing materials to Hartford's agents for at least four years prior to the transaction at issue. Windsor distributed Hartford planning bulletins explaining the IRS provision, which Windsor then distributed to Hartford's outside agents including Ricken, AIMS and Kohn. Windsor therefore had actual knowledge or recklessly disregarded the fact that the IRS

Notice does not require that a new insurance policy be purchased in order to enter into a split-dollar arrangement, and it does not prohibit use of existing insurance policies in such split-dollar arrangements. Also, Windsor's agent Ricken acted with scienter at all relevant times.

ELAR also acted with scienter at all relevant times. ELAR is an experienced producers group that was formed for the very purpose of entering into an agreement with Hartford to promote and sell Hartford insurance products. Under this agreement, ELAR was to use its best efforts to "enhance the profitability" of life insurance underwritten by Hartford including 2001 Policy. On information and belief, ELAR has conducted seminars in order to promote variable life insurance policies. At one such seminar, Kohn made a presentation on variable life insurance policies. ELAR's agents, AIMS and Ricken, also acted with scienter at all relevant times. Hartford, ELAR, Windsor, Ricken, AIMS and Kohn were similarly motivated to induce plaintiffs to purchase the 2001 Policy because they stood to receive substantial commissions for themselves and AIMS.

Plaintiffs allege that Kohn had multiple roles in the sale of the 2001 Policy. In particular, Kohn failed to disclose to plaintiffs that, in addition to providing legal representation to plaintiffs, he acted as an undisclosed agent of Hartford and as a member of ELAR (through his interest in AIMS) in the sale of the

2001 Policy.  On information and belief, Kohn received substantial commissions directly and/or indirectly from Hartford and/or ELAR, in addition to the attorneys' fees plaintiffs paid to him for the legal services he provided in connection with the sale of the 2001 Policy.  Kohn acted in these multiple roles in inducing plaintiffs to purchase the 2001 Policy, and plaintiffs were not aware of these multiple and conflicting roles when they followed his advice and recommendations and purchased the unnecessary 2001 Policy.

**F.  Plaintiffs' Successive Pleadings**

Plaintiffs filed their original complaint on May 31, 2002. Less than one week later, and prior to defendants' filing a response, plaintiffs filed an amended complaint.  Subsequent to defendants' filing of motions to dismiss, plaintiffs, with leave of court, filed their Second Amended Complaint ("the SAC").  We granted, without prejudice, defendants' motions to dismiss the SAC for failure to meet the pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) ("the PSLRA").  See Stephenson v. Hartford Life & Annuity Ins. Co., No. 02 C 3917, 2003 WL 22232968 (N.D. Ill. Sept. 26, 2003) ("Stephenson I"). Plaintiffs then filed a seven-count Third Amended Complaint ("TAC") alleging: a "false statement" claim for violation of § 10(b) of the Securities Exchange Act of 1934 (" § 10(b)") and SEC Rule 10(b)(5) against

Hartford, Ogilvie, Ricken and AIMS (Count I); a "churning" claim for violation of § 10(b) against Ogilvie, Ricken and AIMS (Count II); a "control person" claim for violation of § 20(a) of the Exchange Act against Hartford and Ogilvie (Count III); a common law fraud claim against all defendants (Count IV); an Illinois Consumer Fraud and Deceptive Practices Act (815 ILCS § 505/2) claim against all defendants (Count V); a Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-105) claim against all defendants (Count VI); and a legal malpractice claim against Kohn (Count VII). Defendants moved to dismiss the TAC, again claiming failure to meet the relevant pleading requirements. We denied this motion in a memorandum opinion dated October 1, 2004. <u>See Stephenson v. Hartford Life & Annuity Ins. Co.</u>, No. 02 C 3917, 2004 WL 2260616 (N.D. Ill. Oct. 1, 2004) ("<u>Stephenson II</u>").

Plaintiffs now seek leave to file a Fourth Amended Complaint ("FAC"). The FAC consists of the same seven counts as the TAC, but seeks to add ZHP as a plaintiff, and ELAR and Windsor as defendants to Counts I, III, IV, V and VI. Defendants object to this motion, offering a number of bases for challenge.

## **DISCUSSION**

Federal Rule of Civil Procedure 15(a) governs the amendment of pleadings. Rule 15(a) provides that once a responsive pleading has been filed, "a party may amend the party's pleading only by leave

of court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). Rule 15(a) embodies a liberal approach to amendments, <u>see</u> <u>Diersen v. Chicago Car Exch.</u>, 110 F.3d 481, 489 (7th Cir. 1997); <u>Jones v. Wysinger</u>, 815 F. Supp. 1127, 1128 (N.D. Ill. 1993); <u>see</u> <u>also</u> <u>Nebraska v. Wyoming</u>, 515 U.S. 1, 8 (1995) (noting "the solicitude for liberal amendment of pleadings animating . . . Rule 15(a)"), and stating that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The rule thus "reflects a policy that cases should generally be decided on the merits and not on the basis of technicalities." <u>McCarthy v. PaineWebber, Inc.</u>, 127 F.R.D. 130, 132 (N.D. Ill. 1989); <u>see</u> <u>also</u> <u>Stern v. U.S. Gypsum, Inc.</u>, 547 F.2d 1329, 1334 (7th Cir. 1977) (stating that "this circuit has adopted a liberal policy respecting amendments to pleadings so that cases may be decided on the merits"). As a result,

> [i]n the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should, as the rules require, be "freely given."

<u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). <u>See</u> <u>also</u> <u>Continental Bank, N.A. v. Meyer</u>, 10 F.3d 1293, 1298 (7th Cir. 1993) (reiterating the <u>Foman</u> criteria); <u>Siwik v. Marshall Field & Co.</u>, 945 F. Supp. 1158, 1166 (N.D. Ill. 1996) (same). Only where the prejudice outweighs the moving party's right to have the case decided on the merits should the amendments be prohibited. <u>McCann v. Frank B. Hall & Co.</u>, 109 F.R.D. 363, 365 (N.D. Ill. 1986). The

discretionary decision to grant leave to amend is heavily dependent upon the facts and circumstances of a particular case. <u>In re Brand Name Prescription Drugs Antitrust Litig.</u>, 177 F.R.D. 414, 421 (N.D. Ill. 1997). The decision to grant or deny a motion to file an amended pleading is a matter purely within the sound discretion of the district court. <u>Brunt v. Serv. Employees Int'l Union</u>, 284 F.3d 715, 720 (7th Cir. 2002).

## A. <u>Plaintiffs' Diligence in Moving to Add Defendants</u>

Defendants first argue that the fact that plaintiffs brought this motion to amend their complaint almost four years into the litigation, and after numerous depositions, is evidence of undue delay. Plaintiffs counter that although the lawsuit was filed nearly four years ago, their motion was filed within a year of commencement of formal discovery. Plaintiffs further argue that they filed their motion shortly after learning of key facts regarding ELAR and Windsor.

"As a general matter, 'delay is an insufficient basis for denying a motion to amend unless this delay results in undue prejudice to the opposing party.'" <u>Serfecz v. Jewel Food Stores, Inc.</u>, No. 92 C 4171, 1997 WL 543116, at *3 (Sept. 2, 1997) (quoting <u>Tragarz v. Keene Corp.</u>, 980 F.2d 411, 432 (7th Cir. 1992)). When extreme, delay itself may be considered prejudicial. <u>Id.</u> (citing <u>Tamari v. Bache & Co. (Lebanon) S.A.L.</u>, 838 F.2d 904, 909 (7th Cir.

1988)).  "Newly-discovered information may provide sufficient reason to join a new party as a defendant." <u>Westell Techs., Inc. v. Hyperedge Corp.</u>, No. 02 C 3496, 2003 WL 22088039, at *2 (N.D. Ill. Sept. 8, 2003).  Furthermore, in deciding whether a motion for leave to amend a complaint is timely, "the pertinent factor is when [the opposing party] completed their document production.  Only then could [the moving party] fully synthesize the documents and compose their theory of the case." <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, No. 98 C 3952, 2000 WL 116082, at *7 (Jan. 24, 2000).

In this case, plaintiffs claim that they did not receive documents regarding ELAR and Windsor until October-November 2005, and much of the pertinent deposition testimony was not obtained until early 2006.  Plaintiffs filed the present motion shortly thereafter.  Based upon the foregoing, we find no undue delay by plaintiffs in bringing their motion.

Defendants argue that plaintiffs have long possessed various documents that put them on notice of the existence of Windsor and ELAR, and made it possible for plaintiffs to surmise that ELAR and Windsor may have been involved in the sale or servicing of Stephenson's policies.  However, we agree with plaintiffs that this is inadequate for showing undue delay in this case.  Plaintiffs' claims are subject to heightened pleading standards under Fed. R. Civ. P. 9 and the PSLRA.  <u>See Stephenson I</u>, 2003 WL 22232968, at *5.  The fact that plaintiffs may have been "on notice of Windsor

and ELAR's existence" and may have been able to "surmise that ELAR and Windsor may have been involved in the sale or servicing of Mr. Stephenson's policies" is not enough to enable plaintiffs to state claims against ELAR and Windsor with the required particularity. Indeed, plaintiffs unsuccessfully tried to plead a claim against a different ELAR entity in their SAC, but were unable to do so with the particularity required by Rule 9(b) and the PSLRA. <u>See id.</u>

Furthermore, plaintiffs have provided evidence that defendants delayed in producing certain key documents regarding ELAR and Windsor. Such evidence further supports amendment of plaintiffs' complaint. <u>See SmithKline</u>, 2000 WL 116082, at *7 ("Allowing SmithKline to assert delay as a basis for prohibiting Defendants from amending their answer and affirmative defenses would be inequitable inasmuch as SmithKline has been less than diligent in fulfilling its production obligations."). We find that plaintiffs did not unduly delay in moving to add ELAR and Windsor as defendants. <u>See SmithKline</u>, 2000 WL 116082, at *7 ("Based upon the relatively brief period between the completion of production and Defendants seeking leave to amend in tandem with SmithKline's contributing role, we conclude Defendants did not unduly delay seeking to amend their answer and affirmative defenses.").

**B.    <u>Undue Prejudice from Adding Defendants</u>**

Next, defendants contend that they will be unduly prejudiced by the addition of ELAR and Windsor as defendants. Plaintiffs disagree.[3]

Undue prejudice "is the most important factor in determining whether to allow an amendment to a complaint." In re Ameritech Corp., 188 F.R.D. 280, 283 (N.D. Ill. 1999). "Undue prejudice has been found in cases where the amendment 'brings entirely new and separate claims, adds new parties, or at least entails more than an alternative claim or a change in the allegations of the complaint;' and where the amendment would require expensive and time-consuming new discovery." Conroy Datsun Ltd. v. Nissan Motor Corp. In U.S.A., 506 F. Supp. 1051, 1054 (N.D. Ill. 1980) (quoting A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp., 68 F.R.D. 383, 385 (N.D. Ill. 1975)).

In determining whether undue prejudice exists, courts must balance each party's interests. "This balancing 'entails an inquiry into the hardship to the moving party if leave to amend is denied, the reasons for the moving party failing to include the material to be added in the original pleading, and the injustice

---

[3]Plaintiffs cite SmithKline, 2000 WL 116082, for the premise that where there is no undue delay, the court need not reach the issue of undue prejudice. However, plaintiffs provide an overly narrow reading of SmithKline. In that opinion the court stated that "[b]ecause we find that no undue delay exists we need not examine whether SmithKline is prejudiced by the delay." Id. at *6 n.4 (emphasis added). Under Foman, delay and undue prejudice to the opposing party by virtue of allowance of the amendment are separate reasons for denying a motion for leave to amend a pleading. See Foman, 371 U.S. at 182. Undue prejudice can still be found even if there is no undue delay.

resulting to the party opposing the motion should it be granted.'"
In re Ameritech, 188 F.R.D. at 283 (quoting 6 Charles Alan Wright,
Arthur R. Miller & Mary Kay Kane, Fed. Practice & Procedure § 1487
(1990)).

Defendants contend that they will be prejudiced by amendment
of the compliant because their litigation strategy has been shaped
by the previous dropping of ELAR as a party, and that allowing
plaintiffs to alter their litigation strategy now would require
additional and duplicative discovery on an entirely new area of
inquiry. They further contend that allowing the addition of ELAR
and Windsor will result in extensive and time-consuming motion
practice and discovery. In particular, they claim that an amended
complaint would generate motions to dismiss from each defendant,
could result in over 30 additional sets of written discovery, and
would require at least seven additional depositions. Plaintiffs
reply that defendants overstate the consequences, as much of the
discovery regarding ELAR and Windsor has already been served, and
any additional discovery requests and depositions will be minimal.
These arguments will be discussed in turn.


**1.     Dropping and Re-adding ELAR**

Defendants first contend that Plaintiffs' dropping and then
re-adding ELAR as a party to this lawsuit prejudices them because
they "have shaped their discovery and overall litigation strategy

based on certain beliefs and expectations about the nature of Plaintiffs' suit." Resp. at 13. They contend that "[i]t would be highly prejudicial to Defendants if Plaintiffs are allowed to change course now." Plaintiffs counter that ELAR has been a focus of discovery in this case, and that defendants face a minimal additional requirement of further discovery.

"Motions to amend pleadings so as to restore allegations that the movant previously abandoned create a difficult burden for the moving party since it is obvious that the movant did not suddenly discover a new cause of action." Conroy, 506 F. Supp. at 1054. The burden is on the movant to show that the information upon which the new claim is based was unknown or unavailable prior to the filing of the motion. Id. In the present case, plaintiffs have provided evidence that the information supporting their claims against ELAR was only recently discovered. Also, ELAR has been the focus of plaintiffs' discovery in this case, and defendants are not being confronted with a new co-defendant that comes as a total surprise. We conclude that defendants will not be unfairly prejudiced by the return of ELAR as a defendant.

Defendants point to the Conroy decision from this district in support of their assertion that a plaintiff's dropping and then "re-adding" of claims is prejudicial. However, their reliance on Conroy is misplaced. In that case the disputed claim was deleted from Plaintiffs' amended complaint, and defendant pursued discovery

in the belief that the claim was no longer at issue. <u>See Conroy</u>, 506 F. Supp. at 1054. In contrast, plaintiffs in this case have provided evidence that ELAR has been a focus of discovery. Also, in <u>Conroy</u> plaintiffs asserted that amendment was appropriate because the motion to re-add the claim was based upon recently-discovered information. However, the information was provided by one of plaintiffs' witnesses, and had been available to plaintiffs well before they filed their motion to amend. <u>Id.</u> In contrast, in the instant case the recently-discovered information supporting plaintiffs' motion was provided by defendants, and plaintiffs have provided evidence that they only recently gained access to it. <u>Conroy</u>, therefore, is inapposite.

### 2. Creation of Additional Motion Practice and Discovery

Defendants next argue that addition of ELAR and Windsor will result in extensive and time-consuming motion practice and discovery. Defendants contend that this will unduly prejudice them by substantially delaying the resolution of this lawsuit. Plaintiffs counter that defendants are overstating the impact of the amended complaint, and that substantial delay will not result.

Defendants are correct is asserting that prejudice resulting from additional discovery and briefing can arise when new parties are added to a litigation. "This type of prejudice, however, is not out of the ordinary whenever a new party is added to a

litigation." <u>Westell</u>, 2003 WL 22088039, at *2. "[N]early every amendment results in some prejudice to the non-moving party. New discovery and some delay inevitably follow when a party significantly supplements its pleadings. The test in each case, then, must be whether <u>undue</u> prejudice would result." <u>McCann v. Frank B. Hall & Co., Inc.</u>, 109 F.R.D. 363, 365 (N.D. Ill. 1986) (citing <u>Alberto-Culver Co. v. Gillette Co.</u>, 408 F. Supp. 1160, 1162 (N.D. Ill. 1976)). A court will generally grant leave to amend, even if discovery is substantially completed, if the discovery has adequately covered the subject matter of the amendment. <u>Id.</u> at 367. However, where the amendment significantly changes the complaint, thereby necessitating substantial additional discovery, leave to amend should be denied. <u>Id.</u>

We are not convinced that the proposed amendment changes the complaint to such an extent that substantial additional discovery is required. Both ELAR and Windsor have already been served with discovery, and discovery regarding these two entities has been served on the other defendants as well. Presumably this discovery would go ahead whether or not ELAR and Windsor are added as defendants. We find, therefore, that defendants will not be unduly prejudiced by the additional discovery resulting from amendment of the complaint.

For these reasons, we conclude that defendants will not be unduly prejudiced by the addition of ELAR and Windsor as

defendants.

## C.   **Futility of Amendments**

Defendants next argue that plaintiffs' proposed amendments would be futile.  They argue, first, that plaintiffs' claims against ELAR and Windsor are time-barred, and second, that neither ELAR nor Windsor made any of the representations that plaintiffs ascribe to them.  Plaintiffs counter that the claims are not time-barred, and the allegations contained in the FAC are sufficient to survive a motion to dismiss.

Leave to amend a pleading is appropriately denied when the amendment would be futile.  Brunt v. Serv. Employees Int'l Union, 284 F.3d 715, 720 (7th Cir. 2002).  A proposed amendment is futile only if it could not withstand a Rule 12(b)(6) motion to dismiss. Peoples v. Sebring Capital Corp., 209 F.R.D. 428, 430 (N.D. Ill. 2002).  See also Brunt, 284 F.3d at 720-21 (amendment futile where amended complaint would not survive motion to dismiss).

### 1.      **Timeliness of Claims against ELAR and Windsor**

Defendants contend that plaintiffs' securities claims against ELAR and Windsor under §§ 10(b) and 20(a) of the Securities Act of 1934 and Rule 10b-5 would have to have been filed no later than one year from the discovery of the alleged wrongdoing or three years after it occurred.  They argue that because plaintiffs were clearly

aware of the alleged wrongdoing when the lawsuit was filed in May of 2002, the latest ELAR and Windsor could have been added was May 2003. Even under the 3-year repose period, they claim the amended complaint adding ELAR and Windsor would have to have been filed by June of 2004. Plaintiffs counter that the statute of limitations for these claims is governed by the Sarbanes-Oxley Act, which became effective on July 30, 2002. This Act provides that a private cause of action under the 1934 Exchange Act may be brought not later than the earlier of 2 years after the discovery of the facts constituting the violation, or 5 years after such violation. Plaintiffs argue that they did not become aware of the alleged wrongdoing of ELAR and Windsor until November 2005, and that the violation itself occurred in June of 2001. Thus, under either Sarbanes-Oxley limitation the claims are timely.

Prior to July 30, 2002, a plaintiff had to bring an action under Section 10(b) of the Securities Exchange Act of 1934 "within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991). The Sarbanes-Oxley Act expanded the limitations period for claims involving "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" from one year to two years after discovery of the facts constituting the violation and within five years after such

violation. 28 U.S.C. § 1658(b). Section 804(b) of the Sarbanes-Oxley Act specifically states that the expanded limitations period "shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act." See Sound of Music, Ltd. v. Muzak Holdings, LLC, No. 04 C 6305, 2006 WL 516373, at *4 (N.D. Ill. Feb. 28, 2006). In In re Enter. Mortgage Acceptance Co. Secs. Litig., 391 F.3d 401 (2d Cir. 2004), the Second Circuit held that Sarbanes-Oxley is not retroactive, and the Seventh Circuit stated that it found this opinion to be "persuasive." Foss v. Bear, Stearns & Co., Inc., 394 F.3d 540, 542 (7ᵗʰ Cir.2005). Therefore, in order for the expanded limitations period of Sarbanes-Oxley to apply to the present case, it must have been commenced on or after July 30, 2002.

Although the original complaint was filed prior to enactment of the Sarbanes-Oxley Act, plaintiffs contend that the Act's expanded limitations period applies because the proposed amended complaint incorporating the new defendants constitutes a new proceeding commenced after enactment of the Act. In support of their position plaintiffs rely on Friedman v. Rayovac Corp., 295 F. Supp.2d 957 (W.D. Wis. 2003). Friedman involved a consolidated class action in which all the underlying cases had been filed before July 30, 2002, but plaintiffs amended the complaint in January 2003 to add a new defendant. The court held that the amendment initiated a new "proceeding" for the purposes of applying

the extended statute of limitations under Sarbanes-Oxley. Id. at 975-76. It reasoned that if the plaintiffs had filed a new separate action against the new defendants after July 2002, rather than amending the complaint, "there could be no dispute over the application of the new statute of limitations." Id. at 976. Thus, "[i]t would make little sense to create a rule encouraging judicial inefficiency by requiring separate lawsuits for claims against different defendants arising out of the same conduct." Id.

At least one court has rejected the reasoning of Friedman, finding that an amended complaint is not a new proceeding under Sarbanes-Oxley. In In re Enron Corp. Securities, Derivative & ERISA Litigation, No. H-01-3624, 2004 WL 405886 (S.D. Tex. Feb. 25, 2004), the plaintiffs filed a complaint before July 30, 2002, and then filed an amended complaint adding new defendants on May 14, 2003. The court held that "because the latest complaint is technically an amendment of the previous consolidated complaint, relating to matters that occurred prior to the filing of the previous consolidated pleading," it is not a "new proceeding" governed by the lengthened statute of limitations. Id. at *13. The court reasoned that

> [t]o permit a plaintiff to file a new second suit or a new claim or add a new party in order to circumvent a statute of limitations and expand his legal rights, especially where the clear language of the statute expresses Congress' intent not to permit such expansion, as here, would create legal chaos.

Id. at *16 n.42. The court in Enron instead relied on Gerber v.

MTC Electronic Technologies Co., Ltd., 329 F.3d 297 (2d Cir. 2003),
which considered a similar issue in the context of the Private
Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b). In
Gerber, the court construed Section 108 of the PSLRA, which
incorporates language similar to that of Sarbanes-Oxley. Section
108 of the PSLRA provides that this Act does "not affect or apply
to any private action ... commenced before or pending" on December
22, 1995. In Gerber, the original complaint was filed in January
1995, and an amendment adding new plaintiffs was filed after
December 1995. The Gerber court noted that the statutory language
referred to "actions" rather than "claims," and held that because
the amendment did not create a new "action," the PSLRA provisions
did not benefit the new plaintiffs. Id. at 309-10. It stated:

> In the absence of any indication to the contrary, we doubt
> that Congress intended that courts would apply different sets
> of substantive and procedural rules to groups of plaintiffs
> asserting identical claims in a single action, depending on
> when those plaintiffs were added to the complaint.

Id. at 310. The Enron court then noted that Sarbanes-Oxley, like
the PSLRA, does not refer to "claims" or "parties," but instead to
"proceedings."

We find the reasoning set forth in Friedman to be more
persuasive, and conclude that the longer statute of limitations of
Sarbanes-Oxley applies to the present case. See also Quaak v.
Dexia, S.A., 357 F. Supp.2d 330, 336 (D. Mass. 2005) (longer
statute of limitations applies to second complaint filed against

co-schemer after enactment of Sarbanes-Oxley, "given the remedial nature of Sarbanes-Oxley"). As a result, plaintiffs' securities fraud claims against ELAR and Windsor are not time-barred.

Defendants also argue that plaintiffs' claims under the Illinois Consumer Fraud Act and the Colorado Consumer Protection Act are time-barred because they would have to have been filed within three years after the fraudulent act or discovery of the act. 815 ILCS 505/10a-e; Col. Rev. Stat. § 6-1-115. However, as plaintiffs correctly point out, the discovery rule postpones the starting of the limitations period until it is triggered by plaintiffs' discovery of their claim. See Gredell v. Wyeth Labs., Inc., 346 Ill. App. 3d. 51, 58, 803 N.E.2d 541, 546-47 (1st Dist. 2004). Plaintiffs allege that they became aware of their claims against ELAR and Windsor in late 2005 at the earliest. Such allegations would be sufficient to withstand a motion to dismiss, so plaintiffs' consumer fraud claims against ELAR and Windsor are not barred.

### 2.    Agency Liability of ELAR and Windsor

Finally, defendants argue that plaintiffs fail to allege specific facts to show that Kohn, Ricken, or AIMS acted as ELAR's agents. They further argue that plaintiffs have not alleged facts sufficient to meet the requirements of Rule 9(b) to show that ELAR exercised any control over Kohn, Ricken or AIMS. With regard to

Windsor, defendants contend that it is an administrative clearing house for Hartford that performs only administrative work. "In sum, Plaintiffs are unable to point to any <u>independent</u> acts on the part of Windsor or ELAR that resulted in harm to them, nor do they allege a basis for any independent duties that either of these entities owes them." Resp. at 21. As a result, defendants contend that plaintiffs' amendment is futile. Plaintiffs respond that this court has already held that the agency issue is a fact question. <u>See Stephenson I</u>, 2004 WL 2260616, at *10.

As stated previously, a proposed amendment is futile only if it could not withstand a Rule 12(b)(6) motion to dismiss. <u>Peoples v. Sebring Capital Corp.</u>, 209 F.R.D. 428, 430 (N.D. Ill. 2002). The existence of an agency relationship is a question of fact, ill-suited for resolution on a motion to dismiss. <u>Taylor v. Bob O'Connor Ford, Inc.</u>, No. 97 C 0720, 1998 WL 177689, at *15 (N.D. Ill. Apr. 13, 1998). <u>See also Stephenson II</u>, 2004 WL 2260616, at *10. The issue of whether a defendant is a "controlling person" under Section 20(a) of the 1934 Act also is a question of fact. <u>See In re Sears, Roebuck & Co. Securities Litig.</u>, 291 F. Supp.2d 722, 727 (N.D. Ill. 2003).

Here, the question of whether an agency relationship existed between Windsor or ELAR and the other defendants is inappropriate for resolution at this stage.

**D.** **Timeliness of Motion to Add ZHP**

Although we grant plaintiffs' motion to add ELAR and Windsor as defendants, we reach a different conclusion with regard to adding ZHP as a plaintiff. According to plaintiffs, ZHP has paid premiums for the 1998 Policy on behalf of MRMC, which owns 100% of ZHP. Clearly plaintiffs should have known of ZHP's role from the beginning, and its request to include ZHP as a plaintiff at this late stage is untimely. Where the party seeking an untimely amendment knows or should have known of the facts upon which the proposed amendment is based, but fails to assert them in a timely fashion, the amendment will be denied. In re Ameritech Corp., 188 F.R.D. at 284. See also Conroy, 506 F. Supp. at 1055 (motion to amend count denied where information "readily available to plaintiffs well before the filing of their motion for leave to amend"). Plaintiffs state that they seek to add ZHP as a party "out of an excess of caution." This asserted reason does not justify the resulting prejudice to defendants that would be caused by the required additional discovery.

## CONCLUSION

Plaintiffs' motion for leave to file a Fourth Amended Complaint adding defendants ELAR and Windsor is granted.  Plaintiffs' motion to add ZHP as a plaintiff is denied.


Date:        August 9, 2006


ENTER:    _____
          John F. Grady, United States District Judge